UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:12CR 110 SNLJ |
| ) | |
| MELVIN LEE APPLEWHITE, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

The defendant, Melvin Lee Applewhite, has filed Defendant's Motion to Suppress Evidence and Statements and Memorandum in Support (Document #26) asking for an order suppressing any physical evidence seized from the person or possession of the defendant on April 12, 2012, and any oral or written statements or other writings made by defendant, including conversations in which the defendant participated as may have been overheard by agents of the government and any interviews of the defendant by any law enforcement agents.

The government filed its Response to the Defendant's Motion to Suppress Evidence and Statements (Document #28). An evidentiary hearing was held, after which the defendant filed a Memorandum (Document #36), to which the government filed its Response (Document #41).

As grounds for his motion to suppress, the defendant alleges:

(1) Officer Sullivan did not have probable cause to search the premises of 222 Dorothy Street.

(2) Any oral or written statements made by the defendant were involuntary or elicited by

-1-

coercion and/or were elicited without the defendant being fully advised of and afforded his rights under the Fifth Amendment.

(3) Any oral or written statements were elicited as a result of an unlawful arrest.

(4) Any physical evidence seized from the person or possession of the defendant were seized as a result of searches without a valid search warrant issued upon probable cause.

## Factual Background

This case involves the seizure of a firearm during the execution of a search warrant. On April 12, 2012, Detective Bobby Sullivan of the Sikeston, Missouri, Department of Public Safety (DPS) secured a state search warrant from the Circuit Court of Scott County, Missouri for the defendant's residence located at 222 Dorothy, in Sikeston, Missouri. The search warrant authorized law enforcement officers to search for firearms and ammunition. The search warrant and accompanying affidavit were admitted into evidence as Government's Exhibit #1. Prior to executing the search warrant, officers had also secured a felony arrest warrant for defendant. T he arrest warrant charged defendant with various felony offenses, including burglary and assault, for events occurring on or about April 4, 2012. The felony arrest warrant was admitted into evidence as Government's Exhibit #3.

Detective Sullivan drafted the affidavit in support of the search warrant. In the affidavit, Detective Sullivan stated, among other things, that defendant had contacted Sikeston Department of Public Safety on March 27, 2012, to report a theft from his residence. Specifically, defendant reported that he recently had a party at his residence and $4,500.00 in cash was stolen from his bedroom. Defendant suspected that an individual identified as Anthony Tobias was responsible for the theft. In the affidavit, Detective Sullivan further stated that a burglary and assault was

reported to the Sikeston DPS in the early morning hours of April 4, 2012. The victims reported that two suspects broke into their residence and assaulted them with a pistol. According to the victims, the suspects were looking for an individual named Anthony Tobias, a/k/a "Ant." On April 9, 2012, Detective Keith Lawson met with one of the victims at police headquarters. The victim was given the opportunity to view a photo lineup and positively identified defendant as one of the suspects who broke into their residence. Additionally, on April 11, 2012, Task Force Officer Sullivan was contacted by a reliable confidential informant who advised that they saw defendant inside his residence with a gun on April 10, 2012, stating that he intended to kill Tobias. In the affidavit, Detective Sullivan also stated that defendant had felony convictions in Missouri and Kentucky. (See Government's Exhibit #1).

On April 12, 2012, at approximately 10:35 A.M., a Scott County judge reviewed Detective Sullivan's affidavit and determined that sufficient probable cause existed to support the issuance of a search warrant. Detective Sullivan, along with a number of other officers from the Sikeston DPS, executed the search warrant in the afternoon that same day. Upon making entry, officers located defendant inside the residence at the bottom of a flight of stairs leading to the basement. Defendant was secured and placed under arrest pursuant to the outstanding arrest warrant. Detective Sullivan subsequently read the search warrant to defendant and advised him of his Miranda rights. The defendant was transported to the Sikeston DPS.

The officers proceeded to search the residence pursuant to the search warrant. Detective Sullivan searched the basement of the residence, which was identified as defendant's bedroom. Detective Sullivan located and seized a firearm, a quantity of ammunition and a quantity of suspected cocaine on a bed in the basement. The firearm, which is the subject of the indictment,

is fully described as a Tula Arsenal, Model SKS, 7.62 x 39mm, semi-automatic rifle bearing serial #AP7874N1. Detective Sullivan also located and seized a bag containing a white powdery substance which was concealed in the rafters in the basement. This substance was later determined to be creatine, a non-controlled substance. Additionally, various items providing indicia of occupancy were located and seized, including mail addressed to defendant.

At the Sikeston DPS the defendant agreed to an interview with Detective Sullivan and Detective Keith Lawson. Before the interview was conducted, the defendant was once again advised of his Miranda rights. Detective Lawson presented defendant with a written Miranda waiver form which explained his rights, and defendant acknowledged that he understood those rights. Defendant initialed the form in various places and signed the bottom of the form at 3:35 P.M. T he Miranda waiver form was admitted into evidence as Government's Exhibit #2. After the defendant signed the bottom of the form, the interview commenced. This interview was recorded by the officers. A copy of the recorded interview was admitted into evidence as Government's Exhibit #4.

## Probable Cause

The United States Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. As the Supreme Court stated in Gates more fully, Id.:

The task of the issuing magistrate is simply to make a practical, common sense

decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. Jones v. United States, 362 U.S., at 271, 80 S.Ct., at 736.

The Supreme Court rejected the prior tests required by Spinelli v. United States, 393 U.S. 410, 898 S.Ct. 584 (1969), finding that "the complex superstructure of evidentiary and analytical rules that some have seen implicit" in the Spinelli decision cannot be reconciled with the fact that many warrants quite properly are "issued on the basis of non-technical, common sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." Id. at 235, 2331. The Court offered the following caution to reviewing courts, Id. at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." Spinelli, supra, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," Ventresca, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." Id., at 109, 85 S.Ct., at 746.

Probable cause is

a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. As we said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

Gates, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court found, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from Brinegar v.

United States (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

As the Supreme Court stated in Gates, our review of the sufficiency of the affidavit should not take the form of a de novo review.

### **The Affidavit**

The basis for the application for the search warrant executed on April 12, 2012, at the defendant's residence is contained in the Affidavit of Detective Bobby Sullivan of the Sikeston, Missouri, Department of Public Safety. There follows information contained in the affidavit which was applicable and pertinent to the issuance of the search warrant.

> The defendant contacted police on March 27, 2012, and told them that on March 22, 2012, he had a party for a group of small children. Fifteen adults also attended the party. After the party, Mr. Applewhite found that he was missing $4,500.00 in U. S. currency from the top dresser drawer of his bedroom. Mr. Applewhite said that he talked to the family members of Anthony Tobias, and they told him that Tobias had somehow come into several thousand dollars over the last few days. The family told Applewhite that Tobias had enough money to purchase a vehicle.

> On March 28, 2012, at 23:24 hours, Sikeston Department of Public Safety (SDPS) dispatch got a call of a bullet hole in a vehicle. Officers went to investigate. They spoke to Anthony Tobias's mother, a Deloris Hatcher, who said that that same morning on March 28, 2012, at 1:30 she heard two gunshots outside her residence. She later found a bullet hole in her vehicle she believed was the result of the gunshots outside her residence early that morning. On April 4, 2012, at 4:32 in the morning, the SDPS dispatch received a 911 call from a residence located at 327 Illinois in reference to an assault. When the officers went to the residence in question, the victims told them that two black males broke into their residence that morning and assaulted them with a pistol. The two suspects

kept asking where "Ant," Anthony Tobias, was. The victims said that the intruders told him that they knew Tobias was there because his vehicle was outside. On April 5, 2012, one of the victims of the assault from Illinois Street said that she talked to a friend and identified one of the suspects as Melvin "Blue" Applewhite. The victim said that earlier that day, she was sitting outside when she noticed a white 4-door, possibly a Nissan, traveling by her residence very slowly looking at her vehicle. The victim said that the person driving that car was the same person who broke into her residence last night. The victim said that she saw a picture of him on Facebook and has no doubt that he was one of the two suspects.

On April 9, 2012, SDPS Detective Keith Lawson met with the victim at Police Headquarters. The victim viewed a photo lineup with Mr. Applewhite's photo in it. The victim positively identified Applewhite as one of the suspects who broke into their residence.

On April 11, 2012, Detective Bobby Sullivan received a call from a CI that has been proven reliable through controlled buys and providing information where arrests were made at the federal and state levels. The CI said that they saw Mr. Applewhite at his residence on 4-10-12 with a small handgun, believed to be a .40 caliber, telling them how he was going to kill Tobias.

The Application for Search Warrant, Government's Exhibit 1, along with the Affidavit of Detective Sullivan, were presented to Circuit Judge David A. Dolan. Judge Dolan issued the search warrant.

The application for the search warrant states under oath that the suspect, Melvin Applewhite, is a previously convicted felon in possession of a firearm and resides at 222 Dorothy, Sikeston, Scott County, Missouri. The application asks that a search warrant be issued and that evidence consisting of firearms and/or ammunition, containers that store firearms or spent shell casings and clothing, masks or any items directly related to the burglary/assault.

In the search warrant, Judge Dolan commands that any peace officers in the State of Missouri search for the items set out earlier and if they are found, that the officers seize the articles and return the property so taken and seized together with a verified copy of the inventory

and return them to the court to be dealt with in accordance with the law.  The search warrant states that it is issued based upon the supporting written affidavit that evidence of possession and/or the possibility of firearms inside the residence.  The court finds that the information in the affidavit provided Judge Dolan with "a fair probability that contraband or evidence of crime [would] be found in a particular place."  Gates, 462 U.S. at 238, 103 S.Ct. at 2332.

Judge Dolan had probable cause to issue the search warrant.  Thus, the search warrant was valid based upon probable cause.  As a result, any evidence seized at the defendant's residence pursuant to the execution of the search warrant was validly seized, is admissible in evidence and should not be suppressed.

## Oral or Written Statements of Defendant

Defendant argues in his second point that any oral or written statements made by him were involuntary or elicited by coercion and/or elicited without the defendant being fully advised of and afforded his rights under the Fifth Amendment.

As stated earlier in the Factual Background, "Upon making entry [into defendant's residence] officers located defendant inside the residence at the bottom of a flight of stairs leading to the basement.  Defendant was secured and placed under arrest by authority of the previously issued arrest warrant.  (Tr. 10-11).

The defendant was read the search warrant and then the Miranda warnings from a card by Detective Sullivan.  (Tr. 12).  Mr. Applewhite wanted to know what was going on and Detective Sullivan told him "we would talk when we got to headquarters."  Defendant was transported to police headquarters.  (Tr. 13).  The residence was searched and on a bed in the basement was an assault rifle.  Id.  Also, cocaine was found in a pillow on the bed.  (Tr. 15).  The rifle had been

wrapped in the bed covers with the very end of the butt visible. When the covers were moved to make sure the weapon was safe, Detective Sullivan picked up a pillow and could feel bags in the pillow which turned out to contain cocaine. Id.

Detective Keith Lawson, who was investigating the burglary and assault, interviewed the defendant at the SDPS. (Tr. 42). Prior to the interview, Detective Lawson read the defendant his Miranda rights. Id. The Miranda form, Government's Exhibit #2, was introduced into evidence at the hearing. The defendant initialed the form "YES" following the question, "DO YOU UNDERSTAND EACH OF THESE RIGHTS THAT I HAVE EXPLAINED TO YOU?" Then the defendant initialed "YES" on the form after the question, "HAVING THESE RIGHTS IN MIND, DO YOU WISH TO TALK TO US NOW?" (Government's Exhibit #2). Mr. Applewhite then signed the form. (Tr. 43-44).

During the interview by Detective Lawson, which was principally about the burglary and assault that had occurred approximately one week earlier, the defendant adamantly denied involvement in the burglary. (Tr. 45). At no point during the interview did Detective Lawson make any threats or promises to Mr. Applewhite. (Tr. 46). At some point during the interview, Detective Sullivan came in. (Tr. 45). He asked about the items found in the defendant's house. (Tr. 17).

The defendant told Detective Sullivan that he had been purchasing cocaine from a person out of Cape Girardeau and he had been buying approximately a half to an ounce every four weeks. As far as the firearm was concerned, defendant told Sullivan that someone had shot at his residence and he had gotten it the day before for protection. (Tr. 18). No promises were made or threats were made during Sullivan's part of the interview. Detective Sullivan did not display a

weapon during the interview. The entire interview was recorded. (Tr. 19, 46). The recording was marked "State's [sic] Exhibit 4." It was introduced as Government's Exhibit #4.

The government provided the following quotes from United States Supreme Court cases referring to the status of a defendant who claims his statement was involuntary after he has been given the Miranda warnings and waived them. "Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining the statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina and litigation over voluntariness tends to end with the finding of a valid waiver." Missouri v. Seibert, 542 U.S. 600, 608-609, 124 S.Ct. 2601 (2004). The government also referred to Berkemer v. McCarty, 468 U.S. 420, 433, n. 20, 104 S.Ct. 3138 (1984): "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."

The court finds the statements of the defendant were voluntarily made after he was given and he waived the Miranda warnings as shown by his own initials and his signature at the bottom of the waiver form. The defendant's statements during his interview by both Detective Lawson and Detective Sullivan should not be suppressed and are admissible at trial.

### Defendant's Arrest

In his third point, the defendant argues "Any oral or written statements were elicited as a result of an unlawful arrest." The defendant was arrested pursuant to the arrest warrant which had previously been issued. (Tr. 12). The arrest warrant had been applied for by Detective Lawson. (Tr. 8). Detective Sullivan had the arrest warrant with him when he executed the search warrant. The arrest warrant was introduced into evidence as Government's Exhibit #3. Id.

It is clear that any statements given by the defendant were not elicited as the result of an unlawful arrest since he was arrested pursuant to an arrest warrant.

**Seizure of Physical Evidence**

Defendant argues in point 4 that any physical evidence seized from him or his possession was seized as a result of searches without a valid search warrant issued upon probable cause.

The court has found that the search warrant issued by Judge David Dolan of the Circuit Court of Scott County, Missouri, was issued upon probable cause and, therefore, was a valid search warrant. The evidence seized pursuant to that warrant is admissible in evidence.

**Knock and Announce**

After the evidence was presented at the hearing on the defendant's motion to suppress, the court asked the attorneys to consider in their memoranda the entry of the officers from the SDPS into the defendant's residence on April 12, 2012, to execute the search warrant.

The attorneys have done an excellent job in their memoranda.

The question arises because in general officers authorized by warrant to enter a private dwelling must comply with the Fourth Amendment's "knock-and-announce" requirement. Generally, officers must announce their authority and purpose before entering and may resort to forcible entry only if denied admittance. For federal officials, the knock-and-announce rule is contained in 18 U.S.C. § 3109. See Wilson v. Arkansas. 514 U.S. 927, 934 (1995)("[T]he common-law principle of announcement is 'embedded in Anglo-American law'...." (quoting Miller v. United States, 357 U.S. 301, 313 (1958)). In Miller, the Supreme Court stated that the knock-and-announce requirement restricts the government's authority to intrude upon the citizens' privacy and protects law enforcement officers who might be mistaken as unlawful

intruders if they were to enter a residence unannounced. 357 U.S. at 306-08, 314, n. 12.

The defendant also cites state law contained in Section 544.200 V.A.M.S. to the effect: "To make an arrest in criminal actions, the officer may break open any outer or inner door or window of a dwelling place or other building, or any other enclosure, if, after notice of his office and purpose, he be refused admittance."

In <u>Richards v. Wisconsin</u>, 520 U.S. 385, 394, 117 S.Ct. 1416 (1997), the Supreme Court stated,

> Thus, the fact that felony drug investigations may frequently present circumstances warranting a no-knock entry cannot remove from the neutral scrutiny of a reviewing court the reasonableness of the police decision not to knock and announce in a particular case. Instead, in each case, it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement.
>
> [1] In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.

The defendant argues that the Sikeston police officers did not have a reasonable suspicion that knocking and announcing their presence would have been dangerous or futile or that it would have inhibited the effective investigation of the crime by, for example, allowing the destruction of evidence.

The defendant refers to the transcript:

However, Officer Sullivan's testimony indicates that no one knocked at all (Tr. P. 62). When asked if she (Defendant's mother) answered the door, Sullivan replied "Not - - when you say answered the door, no, she didn't open the door, and, no, she didn't say, Come in. I know that much." (Tr. P. 61). The testimony continued (Tr. P. 62):

> Q. (By defense counsel) Okay. They announced and then - -
>
> A. (By Officer Sullivan) Announced, and the door was unlocked, and they went in.
>
> Q. The door was unlocked. You say there was no forced entry?
>
> A. No ram was used, nothing like that.
>
> It is clear from testimony that the entry was gained immediately following, or in conjunction with an announcement and without attempting to knock on the door.

(Defendant's Memorandum, Document #36, p. 2).

Defendant argues further that there were no exigent circumstances present, <u>Id</u>., nor was there any danger. (Document #36, p. 3).

The defendant requests that the court order suppressed all items of physical evidence seized in addition to any statements allegedly made by defendant, all as being the result of the failure of the government to abide by the protections afforded by the Fourth Amendment to the United States Constitution. Defendant claims the entry made and violation of the knock-and-announce principle render unlawful the seizure of the firearm and, any subsequent statements made by the defendant as being fruit of the poisonous tree. (Document #36, p. 5).

The government, in its response (Document #41), argues that the exclusionary rule is not applicable to "knock-and-announce" violations. The government believes <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006), is dispositive. The government points out in its memorandum (Document #41, p. 8), that in <u>Hudson</u> the State conceded that a "knock and announce" violation occurred during the execution of a search warrant where police officers ultimately recovered a quantity of narcotics and a firearm. The Supreme Court held that the exclusionary rule was not available as a

remedy. It held:

> Suppression of evidence ... has always been our last resort, not our first impulse. The exclusionary rule generates substantial social costs, which sometimes include setting the guilty free and the dangerous at large. We have therefore been cautious against expanding it, and have repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application. We have rejected indiscriminate application of the rule, and have held it to be applicable only where its remedial objectives are thought most efficaciously served – that is, where its deterrence benefits outweigh its substantial social costs.

547 U.S. at 591 (internal quotation marks and citations omitted).

In its further discussion, the Supreme Court found that a "but-for causality" is a "necessary ... condition for suppression." Id., at 592. As the government explains "In other words, there must be a causal like between the constitutional violation alleged and the discovery of the evidence seized. The Court concluded that a knock-and-announce violation could never reach this benchmark." (Document #41, p. 8). The government continues in its memorandum, "Whether a knock-and-announce violation had 'occurred *or not*, the police would have executed the warrant they had obtained, and would have discovered the [evidence] inside the house.' Id. (Emphasis in original)." Id.

The government quotes the Supreme Court when the Hudson Court indicates that the interests protected by the knock-and-announce requirement "do not include the shielding of potential evidence from the government's eyes." Id., at 593. The Supreme Court found that since the interests of the knock-and-announce "have nothing to do with the seizure of ... evidence, the exclusionary rule is inapplicable." Id., at 594. The Court found:

> imposing that massive remedy for a knock-and-announce violation would generate

> a constant flood of alleged failures to observe the rule ... The cost of entering this lottery would be small, but the jackpot enormous: suppression of all evidence, amounting in many cases to a get-out-of-jail-free card. Courts would experience as never before the reality that the exclusionary rule frequently requires extensive litigation to determine whether particular evidence must be excluded.

547 U.S. at 595 (internal quotation marks and citation omitted).

The Court found that "the social costs of applying the exclusionary rule to knock-and-announce violations are considerable" and that "[r]esort to the massive remedy of suppressing evidence of guilt is unjustified." Id., at 599.

The government has cited Eighth Circuit cases following Hudson. In United States v. Gaver, the Court found that Hudson disposed of a defendant's claim that violations of the knock-and-announce requirement required suppression of evidence. The Eighth Circuit found that it "need not consider whether the officers acted reasonably by entering without knocking and announcing, because even if there were a violation of the Fourth Amendment, the exclusionary rule would be inapplicable."

The government cites cases from other circuits to the same effect, that a court need not in the light of Hudson even consider the knock-and-announce rule with regard to suppression of evidence.

The court finds even if there was a violation by the officers of the SDPS of the knock-and-announce rule, evidence acquired by the execution of the search warrant on the defendant's residence and the defendant's statements in his interview should not be suppressed.

**IT IS HEREBY RECOMMENDED** that the defendant's Motion to Suppress Evidence and Statements (Document #26) should be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Lewis M. Blanton
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of April, 2013.